## CIRCUIT COURT OF AUGUSTA COUNTY

William Colavita
and Tina Colavita

v.

Virginia Department
of Social Services

March 8, 2012

Case No. CL11000486-00

By Judge Victor V. Ludwig

This matter comes to the Court on an appeal of the decision of the Virginia Department of Social Services (DSS) denying an adoption subsidy for the adoptive child of Appellants, William and Tina Colavita. The Shenandoah Valley Department of Social Services (SVDSS) initially denied the adoption subsidy, and, after a hearing on the matter, DSS sustained SVDSS's determination in its decision dated February 28, 2011. The Colavitas ask this Court to reverse the DSS hearing officer's determination that SVDSS properly denied an adoption subsidy.

*Brief Summary of Facts and Prior Proceedings*

The SVDSS contacted the Colavitas concerning foster placement of a newborn child, Juan. SVDSS informed the Colavitas that it was very probable that Juan would eventually be available for adoptive placement in the Colavitas' home, but cautioned that eventual adoption was not a certainty. The Colavitas accepted Juan as their foster child, and SVDSS placed Juan in their home in April 2009, only days after his birth on the fourteenth of that month.

Prior to placement (and therefore perhaps even prior to Juan's birth), SVDSS determined that, due to his age, Juan could be placed in a home without an adoption subsidy. As early as May 2009, approximately one month after placing Juan in the Colavitas' home, SVDSS informed the Colavitas that Juan would not be eligible for an adoption subsidy. The Colavitas responded that they disagreed with that determination and intended to appeal it but nonetheless moved forward with the foster placement with the hope of an eventual adoptive placement. SVDSS personnel even discussed with the Colavitas the procedure for appealing the subsidy determination. Transcript of Hearing held on January 11, 2011, at 25.

The parental rights of Juan's birth parents were terminated in March 2010. In April 2010, SVDSS sent a letter to the Colavitas informing them once again that, although Juan was now officially available for adoption, he would not be eligible for an adoption subsidy. At this time, however, SVDSS still had not completed an Adoption Assistance Eligibility Form for Juan.

In July 2010, after Juan had been in the Colavitas' foster care for approximately one year and three months, SVDSS completed an Adoption Assistance Eligibility Form (the Form) for Juan, which concluded that Juan would not be eligible for an adoption subsidy. (The copy of the Adoption Assistance Eligibility Form that is attached to the record of the proceeding below is stamped with the date "AUG 2010." However, the oral testimony indicates that SVDSS completed the form in July 2010. Transcript, at 5, 17.) As nearly as I can ascertain, Sections IV, V, and VI of the form are relevant to the Colavitas' assignments of error in this case. Section IV requires selecting the means by which the child became eligible for adoption. In Juan's case, he became eligible by termination of his birth parents' parental rights on March 26, 2010.

Section V is titled "Basic Eligibility for Virginia Adoption Assistance." It provides three yes/no questions, and states that each must be checked "yes" in order for the child to be eligible. On Juan's form, the first two questions, which ask whether the child is under age 18 and whether the child cannot or should not return to the home, are checked "yes." The final question states:

> A reasonable effort has been made to first place the child with an appropriate adoptive parent(s) without providing subsidy
> or
> It has been determined that the child has a significant emotional tie with the prospective adoptive parents while in their care as a foster child or is being adopted by a relative.

Notably, these statements are in the disjunctive. That is, in order to check no, the reviewing agency must find that neither of these conditions is

present. If either statement is applicable to the child in question, the agency must check "yes." In Juan's case, this box was checked "no," presumably rendering him ineligible for assistance.

I must acknowledge that this criterion contains an ambiguity: it has a set of boxes (for "yes" or "no") for each part of the disjunctives. Because there are two sets of boxes, and because the instructions say that all criteria must be checked "yes," one might infer that this inquiry is conjunctive, not disjunctive. For several reasons, however, I find that this interpretation would be flawed. First, the parties, during oral argument in this Court as well as their testimony before the DSS hearing officer, have indicated that the purpose of the emotional ties criterion is to serve as an exception to the requirement for making a reasonable effort to place the child without a subsidy. This view is supported by Virginia Code § 63.2-1300, which states "[a]n exception may be made to the requirement that efforts be made to place the child in an adoptive home without the provision of adoption assistance when the child has developed significant emotional ties with his foster parents while in their care. . . ." This purpose, providing an exception to the otherwise generally applicable requirement to search for a placement without adoption assistance, could only be accomplished by interpreting these criteria in the disjunctive. Second, on the form that SVDSS filled out for Juan, only one of set of the boxes has a check mark. This suggests that even the agency acknowledges that only one box is needed to serve the disjunctive purpose of the inquiry. Finally, the language of the inquiry, by using the word "or," suggests the disjunctive. All of these factors suggest to this Court that one of the sets of "yes" or "no" boxes on that particular inquiry is superfluous.

Section VI is titled "Special Needs Determination for Adoption Assistance." Its purpose is to determine whether the child is "hard to place" and therefore eligible for a subsidy. Of the six factors or conditions listed, only one, "The child is a member of a minority or mixed racial heritage," is checked "yes." All other factors or conditions are checked "no." The form is signed by the Colavitas, and their signatures are dated August 3, 2010. Handwritten below their signatures is the following: "Our appeal of this board was acknowledged by those present on 7-28-2010," which is initialed presumably by one of the Colavitas.

On July 28, 2010, the Colavitas met with SVDSS to discuss Juan's adoption. The Colavitas brought with them a signed adoption placement agreement dated July 27, 2010. The first section of the placement agreement indicates that the Colavitas acknowledged that their adoption of Juan would not include adoption assistance. It states:

> We will share our home with this child, assuming responsibility for daily living expenses until the entry of the final order of adoption. It is our understanding that the agency retains

responsibility for necessary medical coverage and will continue Medicaid until entry of the final order of adoption. After entry of the final order of adoption, we assume complete responsibility for the daily expenses and medical care.

Ms. Colavita indicated that she was "sort of forced" into signing the placement agreement and acknowledging that there would not be a subsidy because SVDSS told her that they would look for another home for Juan if the Colavitas would not agree to take him without a subsidy. Transcript, at 30–31, 32–33.

The Colavitas appealed the SVDSS's adoption assistance eligibility determination to the DSS. After a hearing held before a DSS hearing officer, the DSS denied the Colavitas' appeal and upheld the denial of adoption assistance for Juan. For convenience, I have set out the hearing officer's "Findings and Conclusions" below:

> Adoption assistance is available for children that are considered hard to place. Children who possess certain characteristics and are determined to be hard to place are provided adoption assistance to avoid such a child remaining in long-term foster care. The purpose of the subsidy is to facilitate adoptions of hard to place children.
>
> Juan was not hard to place due to any special need, and adoption assistance was not needed to facilitate an adoption. The Colavitas went to the hospital to pick up a child they planned on adopting. At every step of the process, the Colavitas proceeded without the promise of an adoptions subsidy. The Colavitas have said that they want to adopt Juan regardless of the availability [of an] adoption subsidy.
>
> From the hospital, or when Juan was one month old, the agency could have placed Juan in another home without delay and without providing assistance. It would be contrary to the intent and purpose of the policy to allow a family to assert their desire to have a foster child placed in their home with the long term goal of adoption knowing that assistance would not be paid, have the child live at their home from the time he was a newborn until a toddler, and then demand adoption assistance because at this point bonds with the family had been formed and it would be against the best interests of the child to find another home that would accept him without the subsidy.
>
> The agency has found a family to adopt Juan without adoption assistance. The Colavitas have stated several times that they intend to adopt Juan regardless of the adoption

assistance. Further, they signed the adoption agreement that indicated that no assistance would be provided.

Juan's birth mother admitted that she might have used drugs and alcohol during pregnancy. She also has a history of mental illness and has been a prostitute. The identity of Juan's birth father is unknown. In view of these facts, the Colavitas are concerned that Juan may have a heightened risk of health care needs in the future. They seek only a Medicaid entitlement for Juan and do not seek a cash subsidy.

*Assignments of Error*

The Colavitas assign the following errors to DSS's decision:

1. The hearing officer lacked substantial evidence to decide that Juan did not meet the criteria of being a child with special needs. . . .

2. The [SVDSS] erred in determining that Juan was ineligible for an adoption subsidy a month after his birth and before his birth parents' parental rights were terminated. . . .

3. The hearing officer erred in finding that Juan could have been adopted without adoption assistance, since the evidence before the hearing officer was that the adoption worker for SVDSS had not made any efforts to place Juan in a [home] without adoption assistance. . . .

4. SVDSS did not follow DSS policy, as outlined in the adoption manual Section 8.A.2.3, in failing to undertake reasonable efforts to place the child in an adoptive home without an adoption subsidy. The hearing officer therefore, lacked substantial evidence to conclude that DSS policy had been followed and that Juan could have been placed in an adoptive home without adoption assistance.

5. SVDSS erred in its determination that Juan was not a child with special needs, when it concluded that he did not have . . . significant emotional ties with the Colavitas when the evidence established that Juan had lived with the Colavitas since birth and was the only family he knew. The hearing officer therefore, lacked substantial evidence to conclude that no emotional ties existed between Juan and the Colavitas. The hearing officer's decision affirming SVDSS's denial of adoption subsidy for Juan was contrary to the uncontroverted evidence that Juan had developed significant emotional ties with the Colavitas and that his best interests would be served by keeping him in the Colavitas' home.

6. The hearing officer's decision affirming SVDSS's denial of adoption subsidy for Juan is contrary to Virginia Code Section 63.2-1300 which provides that a child shall be eligible for adoption assistance, regardless of whether the child could be placed in adoptive home without adoption assistance, when the child has "developed significant emotional ties with his foster parents while in their care and that the foster parents wish to adopt the child."

7. The hearing officer's decision affirming the SVDSS's denial of adoption assistance for Juan was contrary to DSS adoption policy for conditional subsidies. . . .

On the basis of these assignments of error, the Colavitas request that the decision of the DSS hearing officer be reversed and that the Colavitas be awarded their attorney's fees and costs in accordance with Virginia Code § 2.2-4030.

## Standard of Review

The Administrative Process Act, Code § 2.2-4000 *et seq.*, provides that, in reviewing a decision of an administrative agency, "the duty of the court with respect to issues of fact shall be limited to ascertaining whether there was substantial evidence in the agency record upon which the agency as the trier of the facts could reasonably find them to be as it did." Va. Code Ann. § 2.2-4027 (2011). Thus, "the circuit court's role in an appeal from an agency decision is equivalent to an appellate court's role in an appeal from a trial court." *School Bd. of County of York v. Nicely*, 12 Va. App. 1051, 1062 (1991). The substantial evidence standard is not met "if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion." *Commissioner v. Fulton*, 55 Va. App. 69, 80 (2009).

This Court must "review the facts in the light most favorable to sustaining the agency's decision, and take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted." *Jones v. West*, 46 Va. App. 309, 323 (2005). The burden rests upon the party complaining of agency action "to designate and demonstrate an error of law subject to review by the court." Va. Code Ann. § 2.2-4027 (2011). Errors that entitle the Court to set the agency decision aside include the agency's failure to observe required procedure, provided such failure is not merely harmless error. *Id.* § 2.2-4027(iii).

*Analysis*

The purpose of adoption assistance is to "facilitate adoptive placements and ensure permanency for children with special needs." Va. Code Ann. § 63.2-1300 (2011). To be a child with "special needs," the child must be "a citizen or legal resident of the United States who is unlikely to be adopted within a reasonable period of time due to one or more . . . factors." These factors include: a physical, mental, or emotional condition existing prior to adoption; hereditary tendency, congenital problem, or birth injury leading to substantial risk of future disability, or the individual circumstances of the child, including age, racial or ethnic background, or close relationship with one or more siblings. *Id.* "A child with special needs will be eligible for adoption assistance if (i) the child cannot or should not be returned to the home of his parents and (ii) reasonable efforts to place the child in an appropriate adoptive home without the provision of adoption assistance have been unsuccessful." *Id.* However, "when the child has developed significant emotional ties with his foster parents while in their care and the foster parents wish to adopt the child," the requirement for reasonable efforts to place the child in a home without adoption assistance may be waived. *Id.*

The regulations governing adoption assistance are found in 22 V.A.C. § 40-260-20 (2011). These set out both "basic eligibility" requirements for adoption assistance and criteria for determining whether the child has "special needs" as required by statute. To meet the basic eligibility requirements, the child must be: under 18 years old, in the custody of "a local department of social services," and "[p]laced by the local department of social services . . . with the prospective adoptive family for the purpose of adoption." 22 V.A.C. § 40-260-20.B.1. (2011). Juan seems to have met all of these basic eligibility requirements, and neither party appears to dispute this conclusion.

However, under the statutory framework, a child must also be deemed to have "special needs" in order to receive a subsidy. Consistent with the statute, the regulations provide that a child has "special needs" if:

> a. The child cannot be returned home because parental rights are terminated.
> b. The child has individual characteristics that make the child hard to place for adoption due to one or more of the following:
> (1) Physical, mental, or emotional condition existing before legal adoption;
> (2) Hereditary tendency, congenital problem, or birth injury that could lead to future disability, verified by a medical/psychological statement;

(3) Is six years of age or older;

(4) Is a member of a minority or mixed racial heritage;

(5) Is a member of a sibling group that should not be separated; and

(6) Has significant emotional ties with foster parents with whom the child has resided for at least 12 months, when the adoption is in the best interest of the child and when the subsidy is necessary to consummate the adoption by these foster parents.

c. Reasonable efforts have been made to place the child with appropriate adoptive parents without subsidy. A reasonable effort:

(1) Shall be made except when it would be against the best interest of the child because of factors such as the existence of significant emotional ties with foster parents.

22 V.A.C. § 40-260-20.B.2 (2011).

I hasten to point out that, with respect to the regulatory framework, the "significant emotional ties" criterion may be applicable in two different ways. First, it may be used as a factor in determining whether the child is "hard to place" under section (b), in which case the regulation requires the twelve-month time-period and that the foster parents would not adopt without a subsidy. This criterion is not necessarily relevant here because Juan is "hard to place" by virtue of section (b)(3), namely that he is a member of a minority or mixed racial heritage. However, the existence of emotional ties is relevant in this case as it applies under section (c)(1), where it serves as an exception to the requirement to make reasonable efforts to place the child in another home. For this purpose, the regulations do not impose the twelve-month requirement or the requirement that the subsidy is necessary to consummate the adoption by the foster parents.

While the statute and regulations provide legal authority, the DSS Adoption Manual (the Manual), at Volume VII, Section III, Chapter C, section 8, gives expression to these edicts as the policy of the DSS. Consistent with the agency's regulations, the Manual sets out both "basic eligibility" requirements (§ 8.A.1) and criteria for determining whether the child has "special needs" (§ 8.A.2). Both the basic eligibility requirements and the special needs criteria in the Manual are essentially identical to those found in the regulations. The Manual states that a child who meets both the basic eligibility requirements and the special needs requirements "is a child with special needs," and "[a]n adoption assistance agreement must be approved on behalf of the child."

Another source by which to determine DSS's interpretation of its own regulations is the DSS Adoption Assistance Eligibility Form, which is described at some length in the Background section of this letter. Aside

from some minor ambiguities, the Form generally tracks the framework of the regulations and the Manual.

At the heart of this case is an issue that is summarized by the Colavitas in their second Assignment of Error, in which they essentially charge that the SVDSS prematurely determined, just days or weeks after Juan's birth, that Juan was not eligible for a subsidy. According to the Colavitas, the agency's own policy indicates that the first step in determining whether a child is one with "special needs" is finding that the child is legally free for adoption through the termination of all parental rights. The Colavitas argue that SVDSS erred by making the determination prematurely, prior to Juan being "legally free for adoption," and that the hearing officer erred in affirming the SVDSS's action in this regard.

SVDSS argued that, from the very beginning of Juan's placement with the Colavitas, it was understood to be a prospective adoptive placement. Transcript, at 4. For that reason, SVDSS personnel felt it was appropriate to make a determination regarding eligibility for adoption assistance at the time of placement. Ms. Scott attempted to explain the basis for the agency's actions:

> Mr. Dryer: But isn't it true, Ms. Scott, that you cannot even determine according to policy . . . you cannot determine whether a child is eligible for subsidy until the parental rights have been terminated. Correct? Let me direct your attention to 8.a.2.
>
> Ms. Scott: Well, I mean you do not negotiate a subsidy until the rights are terminated.
>
> Mr. Dryer: Right, and you do not determine eligibility then. Right? Technically you do not determine eligibility until the parental rights have been terminated. Correct?
>
> Ms. Scott: I mean if you go straight for the goal of adoption, which is what we did there were already, like I said, discussions that, due to his age, that we could find a placement without a subsidy.

Transcript, at 15. Thus, the agency's rationale was that, because Juan's placement with the Colavitas was a prospective adoptive placement, SVDSS was justified in making a subsidy eligibility determination immediately upon placement (or before). Further, because SVDSS discussed this determination with the Colavitas from the time of Juan's placement, SVDSS was entitled later to rely on eligibility criteria *as they existed at the time of that initial discussion* rather than the time of the official eligibility inquiry.

Consequently, SVDSS concluded that Juan did not have "significant emotional ties" with the Colavitas when completing the form in July 2010 because no such ties existed in the thirty days or so after placement.

Interestingly, the "significant emotional ties" criterion is the only part of the form for which the agency relied on data as it existed at the time of placement. All other sections of the form appear to be consistent with facts as they existed at the time the form was completed, July 2010. For instance, section IV indicates that Juan was available for adoption through the termination of all parental rights on March 26, 2010. The very fact of this inconsistent approach to the various criteria on the form suggests the impropriety of the agency's procedure in this case.

Ms. Scott explained that SVDSS obtained authorization from its regional supervisor to proceed in this way:

> Mr. Dryer: So despite the fact that he had been in their home for more than twelve months; despite the fact that he was . . . that they are the only parents that he knows you still concluded that there were not significant emotional ties that would justify making him eligible for a subsidy?
>
> Ms. Scott: I did not conclude that . . . what was said was that the emotional ties from the very beginning . . . since we . . . we . . . let me go back . . . sorry Ms. Freeman . . . when we were discussing and filling out the eligibility form and it says on the summary of fact, on February 3rd, we spoke to Dawn Caldwell, the Piedmont Regional Adoption Specialist, and she felt that we were still following policy since the Colavitas knew from the very beginning that the agency was not going to offer them a subsidy. So even before we could establish emotional ties, they knew that we were not going to offer them a subsidy.

Transcript, at 15. As I recited above, on this specific issue, the hearing officer summarized (and affirmed) the SVDSS's actions in her Findings and Conclusions:

> From the hospital, or when Juan was one month old, the agency could have placed Juan in another home without delay and without providing assistance. It would be contrary to the intent and purpose of the policy to allow a family to assert their desire to have a foster child placed in their home with the long term goal of adoption knowing that assistance would not be paid, have the child live at their home from the time he was a newborn until a toddler, and then demand adoption assistance

because at this point bonds with the family had been formed and it would be against the best interests of the child to find another home that would accept him without the subsidy.

*In re Colavita,* Va. Dept. of Social Services Admin. Hearing Decision, at 5 (February 28, 2011).

This Court agrees with the Colavitas that the hearing officer erred in affirming the decision of the SVDSS to deny an adoption subsidy for Juan, because it was inappropriate for the SVDSS to rely on their initial eligibility determination (when Juan was only days or weeks old) in order to deny Juan's eligibility for a subsidy after he officially became eligible for adoption.

I find no statute or regulation that would preclude the agency from determining a child's eligibility for adoption assistance at any time. Va. Code § 63.2-1303 provides, "Qualification for adoption assistance payments shall be determined by the local board in response to an application for adoption assistance submitted in accordance with regulations adopted by the Board." This statute mandates that eligibility for adoption assistance is determined in response to an application, and the record in this case does not indicate whether the Colavitas submitted an application for assistance in accordance with the DSS Manual. (See § 8.D.) However, the hearing officer did not indicate that the Colavitas' failing to submit an application for assistance was a basis for her decision affirming the denial of assistance. Therefore, that issue is not properly before this Court on appeal. This statute mandates that the agency must determine eligibility in response to an application, but it does not necessarily preclude the agency from determining eligibility at other times or on its own accord.

Nevertheless, I find that an eligibility determination prior to the termination of parental rights — and thus prior to the child being legally free for adoption — is inappropriate. Determining eligibility prior to termination of parental rights renders the entire inquiry meaningless, because DSS regulations and policy require that a child be free for adoption through termination of parental rights in order to be eligible. By making the eligibility determination prior to Juan's being "free for adoption," the SVDSS contravened its own regulations and policy guidance and, in effect, ensured that Juan would not be eligible. The hearing officer found that the Colavitas' request for a subsidy, after accepting Juan without the promise of a subsidy, is "contrary to the intent and purpose of the policy." But this Court finds that it is contrary to the intent and purpose of the policy to allow the agency to conclusively determine a child's eligibility for adoption assistance prior to that child's being eligible for adoption.

The testimony of Ms. Scott, an SVDSS employee, essentially acknowledges that it is not appropriate to render the eligibility determination prior to termination of parental rights:

Mr. Dryer: Okay . . . well let me just ask you a question again. . . . This adoption assistance eligibility form . . . you would not have filled this out in January or February of 2010?

Ms. Scott: No.

Mr. Dryer: Because the parental rights were not terminated until March of 2010.

Ms. Scott: Right. . . .

Mr. Dryer: And again the special needs criteria . . . the first one is legally free for adoption through the termination of parental rights.

Ms. Scott: [Yes.]

Mr. Dryer: So in order to determine eligibility, that is the first requirement, that is that the parental rights are terminated.

Ms. Scott: Right.

Transcript, at 16. Nevertheless, the SVDSS determined Juan's eligibility immediately after he was placed in the Colavitas' home in February 2009, when he was only days or weeks old and approximately thirteen months prior to the termination of parental rights.

SVDSS grounded its initial denial on its assertion that Juan could have been placed in another home without assistance. The hearing officer accepted that factual assertion, stating "the agency could have placed Juan in another home without delay and without providing assistance." The Colavitas challenged this finding in their third and fourth assignments of error. However, the only evidence offered to show that Juan could have been placed in another home without a subsidy was the testimony of Ms. Scott and Ms. Orebaugh. Neither witness provided any documentation to support their subjective testimony. The DSS Manual provides that a "reasonable effort [to first place the child with an appropriate adoptive parent(s) without providing subsidy] has been made when: local recruitment efforts have been undertaken *and documented*. . . ." Manual § 8.A.2.3 (emphasis added). Arguably, because SVDSS provided no evidence to document its effort to place Juan in another home, it did not satisfy its own requirements for making a "reasonable effort" to do so. Therefore, although the subsidy was properly denied at that time, that is, when Juan was initially placed with the Colavitas, by virtue of Juan's not being legally free for adoption, the SVDSS's stated grounds for denying the subsidy were arguably invalid.

Ultimately, the agency action that was truly contrary to the intent and purpose of the agency's regulations was the agency's reliance on the circumstances of its initial determination in February 2009 as grounds to deny Juan an adoption subsidy in July 2010, after the termination of his birth parents' parental rights, that is, the July 2010 finding of no "significant emotional ties" on the grounds that none existed at the time of the initial placement in February 2009, when the determination was initially made. The effect of this *ex post facto* determination was to preempt the Colavitas' later efforts to appeal it, that is, by making the eligibility determination at a point when Juan categorically could not have qualified for a subsidy, the SVDSS created a circumstance in which the Colavitas' mere acceptance of Juan into their home undercut their subsequent efforts to appeal the eligibility determination.

In a manner of speaking, both the SVDSS and the hearing officer reasoned that the Colavitas were *estopped* from seeking a subsidy for Juan because they took him into their home with the understanding that he was not eligible. In the words of the hearing officer, the Colavitas took Juan into their home "knowing that assistance would not be paid." This rationale is faulty for both legal and factual reasons. First, the evidence showed that the Colavitas disputed SVDSS's initial eligibility determination. All three witnesses testifying before the hearing officer, two of whom were SVDSS's witnesses, said that the Colavitas, on several occasions, and from the very beginning of Juan's placement in their home, expressed their intent to appeal the eligibility determination. The Adoption Assistance Eligibility Form signed by the Colavitas on August 3, 2010, notes their intent to appeal the decision. Thus, one of the fundamental assumptions in SVDSS's decision and thus in the hearing officer's affirmation of that decision is faulty: the Colavitas did not accept Juan with the understanding that he would not receive a subsidy. They rejected that decision and expressed their intent to contest it.

More importantly, however, the agency's rationale placed the Colavitas in an utterly untenable situation: by accepting the child into their home, this very acceptance forestalled any effort to appeal the agency's denial of the subsidy (even though it is fair to say that the denial was a sham, because it was rendered at a time when Juan was not legally free for adoption and therefore no decision other than denial could result). Their only alternative was to refuse to take the child. In other words, even if they had firm ground to believe that the subsidy determination is erroneous, they could not accept the child without in effect sacrificing their right to challenge the determination. But mere acceptance of a child — particularly when the acceptance is accompanied by the family's clear and unequivocal disagreement with the subsidy determination — cannot itself serve as a basis for forestalling the adoptive family's statutory right to appeal the determination. *See* Va. Code Ann. § 63.2-1304 (2011) ("Any applicant for

or recipient of adoption assistance aggrieved by any decision of a local board or licensed child-placing agency in granting, denying, changing, or discontinuing adoption assistance may . . . appeal therefrom to the Commissioner."). That is, in essence, what the agency has held in this case.

I reiterate that there appears to be no dispute that Juan met all of the "basic eligibility" criteria for adoption assistance, that is, Juan was less than eighteen years old, was in the custody of SVDSS, and was placed with a prospective adoptive family for the purpose of adoption. *See* 22 V.A.C. § 40-260-20.B.1 (2011). The issue, then, is whether Juan was a child with "special needs."

The hearing officer determined that "Juan was not hard to place due to any special need." The Colavitas challenged this finding in their first assignment of error. This finding, however, is contrary to law and does not have substantial evidentiary support. The testimony that presumably supports this finding came from two SVDSS employees who stated their view that Juan could have been placed in a home without a subsidy. But this evidence is insufficient to overcome the stark fact that Juan, by virtue of his minority status and perhaps other factors, as well, possesses a characteristic that is sufficient under the law to demonstrate that he has "special needs." The hearing officer's finding that Juan did not have "special needs" and was not "hard to place" was based not on the statutory, regulatory, or policy (as expressed by the Manual and the Adoption Assistance Eligibility Form) standards for making that determination, but rather was based on the testimony of the SVDSS employees regarding their subjective impressions of their ability to place Juan in another home without a subsidy. Neither the law nor DSS's policy standards regard such subjective impressions as dispositive or even relevant.

Under the express guidance of the agency's own regulations, as well as the agency's expression of those regulations as embodied by the Manual and the Adoption Assistance Eligibility Form, Juan qualified as having "special needs." The uncontroverted evidence indicates that the three criteria needed for a finding of special needs were met in this case. First, Juan's birth parents' parental rights were terminated. *See* 22 V.A.C. § 40-260-20.B.2.a (2011). Second, by virtue of Juan's minority status, he possesses a characteristic that made him "hard to place." *See* 22 V.A.C. § 40-260-20.B.2.b.(4) (2011). Indeed, SVDSS itself concluded that Juan had "special needs" and recorded that conclusion on the Adoption Assistance Eligibility Form. Yet, the hearing officer, apparently ignoring the agency's own findings on this issue, inexplicably found that Juan did not have any special need.

The final criterion, that reasonable efforts had been made to place Juan in a home without adoption assistance, need not have been met in this case because the exception under § 40-260-20.B.2.c.(1) applied to Juan, that is, Juan had developed significant emotional ties with his foster family, thereby

relieving DSS of the regulatory necessity of searching for a family who would adopt Juan without a subsidy. The Colavitas challenged the hearing officer's affirmation of SVDSS's finding no "significant emotional ties" in their fifth and sixth assignments of error. The evidence overwhelmingly indicates that, in July 2010, when SVDSS completed the Adoption Assistance Eligibility Form, Juan had developed "significant emotional ties" with the Colavitas. Testimony supporting the existence of emotional ties between Juan and the Colavitas came from every witness in the hearing held by the agency. On cross-examination, Ms. Scott, the adoption worker at SVDSS who handled Juan's case, testified as follows:

> Mr. Dryer: Based on the times that you visited, what kind of observations have you made between Juan and the Colavitas and the rest of their family as far as his emotional attachment to the family?
>
> Ms. Scott: That he is attached . . . I mean . . . Tina [Ms. Colavita] is the only mom he has ever known. . . .

Transcript, at 14. Another SVDSS witness, Ms. Orebaugh, who works as the Senior Foster Care Social Worker at SVDSS, testified as follows:

> Mr. Dryer: And what has been your observation of Juan with the Colavitas since you placed Juan in their home in April of 2009?
>
> Ms. Orebaugh: Happy . . . happy . . . content . . . well cared for. . . .
>
> Mr. Dryer: Do you believe that he has a significant emotional tie to the Colavitas?
>
> Ms. Orebaugh: Oh yes.

*Id.* at 24. Predictably, Ms. Colavita, the only other witness to testify, also felt that Juan had significant emotional ties to her family, and she had serious concerns about the possibility that Juan could be removed from their home. *Id.* at 32. In view of this evidence, the only conclusion this Court can draw is that, by the time his eligibility for an adoption subsidy was officially considered in July 2010 (and arguably beginning shortly after his placement with the Colavitas), Juan had developed significant emotional ties with the Colavitas.

Therefore, when it completed the form, SVDSS was simply wrong in selecting "no" regarding the existence of "significant emotional ties"

between Juan and the Colavitas. SVDSS inappropriately relied on the state of Juan's attachment to the Colavitas as it existed when he was initially placed, rather than as it existed when the form was completed. As discussed above, this approach made it inevitable that Juan would not be eligible for a subsidy, both because he was not legally free for adoption and also because, however one defines "significant emotional ties," no child will be so attached immediately upon being placed with a foster family. The hearing officer's decision essentially ratified this improper approach and, therefore, was erroneous.

One aspect of the hearing officer's rationale is, on its surface, persuasive. The hearing officer emphasized that "[t]he Colavitas have said that they want to adopt Juan regardless of the availability [of] adoption subsidy." The final paragraph of the hearing officer's findings and conclusions indicates that this fact was pivotal to the hearing officer's decision. "The agency has found a family to adopt Juan without adoption assistance. The Colavitas have stated several times that they intend to adopt Juan regardless of the adoption assistance." Ms. Colavita admitted this during the hearing. Transcript, at 34. The Colavitas even signed a "Placement Agreement," which indicated their intent to adopt Juan and "assume complete responsibility for daily expenses and medical care." Thus, the hearing officer's decision appears to be driven in part by the conclusion that the Colavitas, in admitting that they wanted Juan even if he was not eligible for a subsidy, served to satisfy the requirement that the agency make reasonable efforts to find a family that would take Juan without a subsidy. Having found such a family in the Colavitas, the agency determined that Juan was not eligible for a subsidy.

This reasoning is flawed for several reasons. First, as discussed above, the requirement to make reasonable efforts to place Juan without a subsidy need not have been met in this case. Juan had developed significant emotional ties with his foster family, and therefore the agency need not and should not have sought to place Juan with a family, the Colavitas or otherwise, without a subsidy. *See* V.A.C. § 40-260-20.B.2.c(1) (2011).

Second, I find that the agency's interpretation, that requirements to make reasonable efforts to place the child without a subsidy may be satisfied by seeking such unsubsidized placement with the foster family with whom the child has developed significant emotional ties, inevitably interferes with the implicit purpose of the exception codified at V.A.C. § 40-260-20.B.2.c(1) ("Reasonable efforts . . . to place the child with appropriate adoptive parents without subsidy . . . [s]hall be made except when it would be against the best interest of the child because of factors such as the existence of significant emotional ties with foster parents."). The fundamental purpose of this exception is to subordinate the need to find a "non-subsidy placement" and elevate the benefit of allowing the child to remain in a caring home to which he has become attached, even if that means providing a subsidy that might otherwise be avoided. Refusing a subsidy under the agency's rationale,

because the foster family, with whom the child has developed significant emotional ties, is committed to adopting the child with or without a subsidy, renders the exception meaningless. A family that had developed "significant emotional ties" with a child would ordinarily (and perhaps inescapably) be committed to adopting him with or without a subsidy. Under this view, the codified exception could be avoided in virtually every case. In other words, an exception that purportedly applies whenever there are "significant emotional ties" would, as a matter of course, be rendered inapplicable by the very existence of the "significant emotional ties."

Finally, I find the agency's approach to be, at best, bad policy or, at least, inconsistent with the policy of the statutory scheme. The Code and the attendant regulations, (Va. Code § 63.2-1300 and V.A.C. § 40-260-20(B) (2)(c), respectively, cannot reasonably support an interpretation that has the effect of penalizing the family's commitment to the child. A family's willingness to care for a child, even if the child is not eligible for an adoption subsidy, is a signal of their unequivocal commitment to him. But, under the agency's approach, the family, by declaring such a commitment, is penalized by virtue of it, because the agency reckons that it has satisfied the requirement to place a child without a subsidy.

The Colavitas' signing of a Placement Agreement, by which they effectively agreed to adopt Juan without adoption assistance, cannot finally resolve the issue of whether Juan is eligible. The Colavitas' signing of the Placement Agreement merely demonstrates their intent to adopt Juan regardless of the ultimate subsidy determination. But doing so cannot undermine their statutory right to appeal that determination, just as accepting Juan in their home, even as SVDSS communicated that Juan would not likely be eligible for a subsidy, cannot undermine their right to appeal the subsidy determination.

Moreover, the evidence indicates that the Colavitas signed the Placement Agreement indicating no adoption subsidy would be provided because Ms. Colavita was told by the SVDSS that, if she did not do so, Juan could be placed in another home. In view of the laws and regulations governing this matter, as discussed in this letter, the threat of removing Juan was improper. Therefore, even if the Placement Agreement could serve as a contractual foundation for denying adoption assistance to Juan, a proposition that I do not accept, the Colavitas' agreement to adopt Juan without a subsidy was induced by the agency's improper application of the Code and DSS regulations.

In view of the Colavitas' persistent disagreement with the agency's eligibility determination and demonstrated intent to appeal that determination, the Placement Agreement cannot serve as a waiver to their right to appeal.

## Conclusion

I do not overturn the decision of the hearing officer lightly. I understand the deference to which an agency is entitled with respect to interpreting and applying its own regulations. But I owe a greater deference to the law and to its faithful and consistent application. In denying Juan's eligibility for adoption assistance, the SVDSS adopted an interpretation of its own policies and regulations that undermined both their letter and their spirit. By determining Juan's eligibility prior to or at the time of his placement, the SVDSS ensured he would not be eligible. It then unfairly placed the Colavitas in a circumstance in which their very acceptance of Juan into their home undermined their ability to appeal the subsidy determination. This is a distortion of the principles underlying the laws and regulations governing adoption assistance.

Accordingly, this Court finds that the hearing officer erred in affirming SVDSS's decision that Juan is not eligible for adoption assistance. As of July 2010, when Juan's eligibility was officially determined, he met both the basic eligibility requirements and the special needs criteria, as set out by the Virginia Code, DSS regulations, and DSS policy as expressed in the DSS Adoption Manual and Adoption Assistance Eligibility Form.

The Court also finds that the Colavitas are entitled to recover their reasonable costs and attorney's fees pursuant to Va. Code § 2.2-4030. I ask that Mr. Dryer circulate an affidavit stating the reasonable costs and fees incurred by the Colavitas in this matter. The agency may contest the reasonableness of the claimed fees and costs by, within fourteen days after receiving the affidavit, circulating notice of its intent to contest the claim and putting the matter on the Court's earliest Motions Day for hearing, if necessary. In the absence of such a notice and, if necessary, Praecipe from the agency, the Court directs Mr. Dryer to prepare a final order in this matter. In that case, I ask that the order incorporate both this opinion letter and Mr. Dryer's affidavit of reasonable costs and fees.